# CHARLESTON.

KELLEY & MOYERS v. BOWMAN.

Submitted August 9, 1910.    *Decided August 10, 1910,

1. STATUTES—*Construction—Words Free from Ambiguity.*
    Where the words of a statute are plain, free of ambiguity, conveying a plain intent, there is no room for construction by a court, but only for obedience to the legislative will.

2. SAME—*Construction—Clearly Expressed Intent in One Part and Doubtful Clause in Another.*
    A clearly expressed intent by plain words in one part of a statute cannot be defeated by mere implication from a doubtful clause in another part.

3. SAME—*Construction.*
    If a subsequent clause in a statute is obscure, it will not control a previous clear clause.

4. SAME.
    When one section or clause of a statute treats specially and solely of a particular matter that section or clause prevails, as to that matter, over a section or clause referring to such matter only incidentally.

*Opinion filed October 25, 1910.
68 W. Va.

5.  INTOXICATING LIQUORS—*Licenses.*

Under its charter act, chapter 1, Acts 1909, the Board of Affairs of the city of Bluefield has power to grant license to sell spirituous liquors without the consent of the county court of Mercer county.

6.  SAME—*Licenses—Duty of County Clerk to Give Certificate.*

After a grant of license to sell spirituous liquors by the Board of Affairs of the city of Bluefield, it is the ministerial duty of the county clerk to give to the licensee the certificate to perfect the license provided for by Code 1906, chapter 32, section 16.

*Mandamus* by M. H. Kelley and others, partners as Kelley & Moyers, against E. L. Bowman, Clerk of the County Court of Mercer County.

*Writ Awarded.*

*Sanders & Crockett,* for petitioners.

*D. M. Easley, Hugh G. Woods,* and *James F. Brown,* for respondent.

BRANNON, JUDGE:

Kelley & Moyers obtained an order of the Board of Affairs of the city of Bluefield granting leave for them to obtain a license to sell liquors in that city. They applied to the county court of the county for an order directing a certificate to be issued to enable them to pay the tax and perfect their license; but the court refused to make the order. Kelley & Moyers then applied to the clerk of the county court for such certificate, and he refused to issue the certificate. This certificate is provided for by statute. The Code of 1906, § 16, chapter 32, provides that when the consent of "the county or license court" for license has been obtained the clerk shall give the applicant a certificate of the fact of the consent of the proper authority, and on payment to the sheriff of the tax and his endorsement of payment on it the certificate constitutes a legal license. This duty of the clerk is purely ministerial. He has no discretion to withhold it if the party has the consent for license of the proper authority. When Kelley & Moyers were so refused this certificate they applied to this Court for a *mandamus* to compel the clerk to issue the certificate.

This case is governed by chapter 1, of the Acts of the Legislature of 1909, an act amending and re-enacting certain statutes constituting the charter of the city of Bluefield. This act of 1909 is the present charter of that city. This act in section 4 provides that the municipal authorities of the city shall consist of four commissioners constituting a Board of Affairs, and the Council. Section 6 says that "all the corporate powers of said city shall be vested in and exercised by the board of affairs or under its authority, except, as otherwise provided in this act." Just here we note that this is a broad power. That section is immediately followed by section 7, saying that "The board of affairs of said city shall have and are hereby granted power to have said city surveyed; * * * to have the sole and exclusive right to grant, refuse or revoke any and all licenses for the carrying on of any business within said city on which the state exacts or may exact a license tax." This grant of authority to allow license is one of a large number of powers given the board of affairs by that section 7, covering the whole field of municipal authority. The contention made by the clerk in resistance of the *mandamus* is that the consent for license given by the board of affairs is not sufficient without the concurrence of the county court. It is true that under the statute relating in general to liquor licenses to be exercised within municipalities, the consent of both council and county court is requisite; but we are acting under a special act constituting the law of a particular city, and we must test this case by that act. Now, I am decidedly of opinion that under this section 7, taken alone, by reason of the words giving sole and exclusive power to the board of affairs, there could be no question as to the sufficiency of the order of that board to entitle Kelly & Moyers to the clerk's certificate to enable them to pay the tax and perfect their license. But it is said that we can not act on that clause of the statute alone, but must look to section 59 which reads, so far as concerns this case, as follows: "Whenever anything for which a state license is or may be required is to be done within said city or within two miles of the corporate limits thereof, the board of affairs as herein provided may by ordinance require a city license to be had for doing the same, the amount of which license shall be fixed by the board of affairs, in no case, however, to be less than the amount charged

by the state for a license for doing the same thing, and may in any case, require from the person licensed a bond, with sureties and in such penalty and with such conditions as it may deem proper, and the board of affairs on notice, may revoke such license at any time if the condition of the said bond be broken; and no license to sell strong or spirituous liquors or wine or beer, ale, porter or drinks of like nature, within said city, or within two miles of the corporate limits thereof, shall be granted by the county court of Mercer county, unless the person applying therefor shall produce to said county court the certificate of the board of affairs of said city, that said board of affairs has granted a city license authorizing said person to sell as aforesaid and the same has not been vetoed by the council as herein provided for." Great stress is laid upon the closing clause of section 59 in defense of this *mandamus,* the contention being that the county court must give its consent to the license. I have already said that it is conceded that the words of section 7 declaring that the board of affairs shall have sole and exclusive right to grant license, taken alone, would give the consent of that board full force and effect. Is the force of that clause of the statute destroyed by the closing clause of section 59? I may say that if the intent of the legislature was to grant to the board of affairs absolute power to grant or refuse license, it could not have selected from the vocabulary of the English language more forceful words to accomplish such purpose than the words "sole and exclusive right to grant." I need hardly summon here the rule laid down by all authority that courts must carry out the will of the legislature when plainly expressed. Get its intent when it has plainly expressed it and obey it. In such case, where the words are plain and unquestionable in meaning, the question is not one of construction, but one of implicit obedience to the legislative power. It is a well established rule of construction that it is not permitted to interpret what needs no construction. Where the act is expressed in clear and precise terms, when the sense is manifest, there can be no reason to substitute a meaning or surmise or guess about it. *Commonwealth* v. *Gains,* 2 Va. Cases 172; 12 Encyclopedic Digest Va. & W. Va. Rep. 760. If we allow this plain language of power of the board of affairs to be frittered away by reference to the section 59, what do we

do? We take from this important body a. power manifestly,. clearly, vested in it upon mere implication and surmise. Here I will cite a principle of construction of statutes that is very plain. We can not do this by mere implication, and deny this "sole and exclusive power" in the board of affairs in that important section specifying its many powers, without plain words to justify us. Such words are not in section 59. To thus qualify or deny this power of the board we must run counter to the rule that hardly needs any authority, but is clearly stated in *Railroad Co. v. Traction* Co., 56 W. Va. 18. "A clearly expressed intention in one part of a statute does not yield to a doubtful construction of another portion of it; and when the general intention of the legislature is clear and the spirit and purpose of the statute are manifest, a mere implication or inference of a contrary particular or special intent, arising out of language of doubtful meaning, must yield to the general intent." (Pt. 9). Now, suppose we say that the consent of the board of affairs is not good without confirmation by the county court. How, then, can we say that the power of the board of affairs is "sole and exclusive?" The act does give council power to veto the board of affairs, but that is provided in plain words by the statute; but no plain words of veto are found to give the county court such power. We say that if it had been the intent of the legislature to qualify this "sole and exclusive power" in the board, it would have said so in plain words; but we are called upon to insert such words, to infer such intent—a mere implication. A repeal of a vital and clear clause, expressed in explicit language, by sheer implication, and that against the plain, general purpose of the statute in this respect, clearly apparent in the act, that is, to confine this license power to the board of affairs. I repeat in the language of *Railroad Co. v. Traction Co., supra.* in pt. 8 of the syllabus, that "a clearly expressed intention in one part of the statute does not yield to a doubtful construction in another portion of it." Mere implication will not do. Appeal was made in argument to the principle referred to in *Spiedel* v. *Warder,* 65 W. Va. 602, that where clauses of a statute are in irreconcilable conflict the latest clause shall prevail. Generally it is so; but I doubt its application when the manifest and dominant intent crops out in an earlier clause and I say that this act

clearly imports an intent to give this important body, the board of affairs, this important power, sole control over the liquor question. "If a subsequent clause is obscure, it will not control a previous clear provision." *State* v. *Williams,* 8 Ind. 191. And another thought here comes in, and it is this; the clause giving the board this sole and exclusive power as to licenses is specific, applicable only to the subject of license, special to it, whereas the closing clause of section 59 is not so specific. Turning to 26 Am. & Eng. Ency. L. 619, we find it stated that "the clause which is directed specially to the matter in preference to others mentioned in it incidentally only" shall prevail. And in the same volume, p. 618, is this statement of the law: "It is an old and familiar rule that where there is. in the same statute a particular enactment and also a general one, which in its most comprehensive sense would include what is embraced in the former, the particular enactment must be operative and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment. But this rule is subordinate to the principle just stated, that statutes are to be so construed that if possible full effect shall be given to all parts thereof." I quote note 1, "Where one section of a statute treats specially and solely of a matter, that section prevails in reference to that matter over other sections in which only incidental reference is made thereto, because the legislative mind having been in the one section directed to this matter must be presumed to have there expressed its intention, rather then in other sections where its attention was turned to other things. *Long* v. *Culp,* 14 Kan. 412, citing *Griffith* v. *Carter,* 8 Kan. 565." I consider this doctrine pointedly applicable in this case, even if we say that the two clauses are directly in conflict.

But are these sections in conflict? I say not. The part of section 59 above quoted has not for its purpose the granting of license, and certainly not for the purpose of conferring the power upon the county court. Its main purpose is to give the city express power to levy a license tax and require bond and revoke license. Powers which without this clause it might not have, as a municipality can only levy taxes on subjects authorized by the legislature. Other statutes give power to the county court, in general cases, to grant or refuse license where no special

act is involved, and it was not the mission of section 59 to confer that power upon a county court. We see that it does not expressly and affirmatively grant such power to the county court in the case of Bluefield. The most that can be said is that it *recognizes* such power; but it surely does not expressly grant it, and we can not give it this power by mere implication to nullify a power plainly granted to the board. I think that the closing provision of section 59 was inserted out of caution to protect the absolute power of the board of affairs in this matter. The draughtsmen thought that as the county court had power to grant license in Mercer county outside the city of Bluefield, its order might be claimed to warrant its exercise in the city or at least within two miles of it, and the clause was inserted to say that if the county court should grant license in the county it should not be held to operate inside the city or within two miles thereof. I can see another reason for this precautionary clause. Section 7 gives the general power to grant or refuse license inside the city, without mentioning two miles outside the city limits. Then section 59 authorizes the city by its board of affairs to levy a tax on a license to be exercised within the city or within two miles of the corporate limits of the city. Without the closing clause of section 59 there might be question whether a license granted by the county court could be exercised outside the city limits but within two miles thereof, and this closing clause of section 59 was inserted to protect not only the city within its limits, but to clearly make the county court's grant not good within two miles of the city. By the charter as it existed before the Act of 1909 a license was good within one mile of the city. A purpose of this clause in the new act was to extend the limit to two miles. I have already said that this last clause of section 59 does not affirmatively grant power to the county court as to licenses within the city, and that we can not give it such power by mere implication. I would, however, call the attention to the fact that this last clause is merely prohibitory. It prohibits the county court from granting license operative within two miles of the city limits. It is only a restrictive clause. I say that it supports the theory that the power of the board of affairs is sole and exclusive, because this clause prohibits the county court from going within the two miles limit, and this preserves and

defends the sole and absolute power of the board of affairs in the matter. Perhaps that clause was not necessary for this purpose; but there it is, and we can assign it a function and purpose that shall make it not conflicting with the provisions of section 7. It is our duty to give it such construction as shall avoid conflict between the different clauses of the statute. *Railroad Co.* v. *Traction Co.,* 56 W. Va. 18, pt. 8.

In support of the proposition that the purpose of the legislature was to give the board of affairs sole power, I would state the fact that the charter as it existed under chapter 3, Acts 1905, gave the council power to grant, and to grant only city license, whereas the Act of 1909 creates a board of affairs with sole and exclusive right to grant, refuse or revoke, "any and all licenses". This power over "any and all licenses", covering all state licenses, was first inserted by the Act of 1909. This change means something. It widened the powers of the board over the council, and made the board a license court for all licenses, state and city, within the city. Reflect that under the Act of 1905 the council was simply authorized to grant license by the language, " the council may require a city license to be had," leaving room to say that the county court yet participated; but the Act of 1909 creates a board of affairs, and takes from the council the license power, and vests it in the board by the strong language "to have sole and exclusive right to grant, refuse or revoke," etc. What does the insertion of these words "sole and exclusive" mean? They were not annexed to the former council power, but they are made an element of the power of this important board of affairs. This material alteration must surely have a great force.

We have been asked to review former decisions, and hold as unconstitutional any legislative act giving a city sole power to grant license without the consent of the county court; but we think this question should rest under these decisions.

We award the *mandamus* against the clerk.

*Writ Awarded.*

ROBINSON, PRESIDENT, *dissents.*

WILLIAMS, JUDGE, (*dissenting*) :

Kelley & Moyers were granted a license by the board of affairs of the city of Bluefield to sell in toxicating liquors at retail in

said city. They then applied to E. L. Bowman, clerk of the county court of Mercer county, for a state license. He refused to issue it, and plaintiffs have applied to this court for a writ of *mandamus* to compel him to do so. Whether the writ should be granted, or not, depends upon the question of the power of the city to grant both a state and city license to sell intoxicating liquors. The question requires a construction of the city's charter. Properly construed, I think no power is given to grant a state license. Its charter is chapter 1, Acts of 1909, section 6 of which reads as follows:

"All the corporate powers of said city shall be vested in and exercised by the board of affairs, or under its authority, *except as otherwise provided in this act.*" Italics are mine.

Section 7 reads, in part, as follows: "The board of affairs of said city shall have and are hereby granted power to have said city surveyed;" etc., then follows a long list of enumerated powers, consisting of more than five printed pages, and among them is the following, viz: "To have the sole and exclusive right to grant, refuse or revoke any and all licenses for the carrying on of any business within said city on which the state exacts or may exact a license tax." This language must be read and construed in the light of other portions of the act. It is not proper to construe the language of a single isolated clause of a statute according to the literal meaning of the words employed, when there are other provisions of the act which show that the words were intended to be taken in a limited, or qualified sense. The intention of the law makers will prevail over a strict and literal sense of any particular clause in an act, when the intention becomes clearly manifest from the act taken in its entirety. "Not only may the meaning of words be restricted by the subject matter of an act or to avoid repugnance with other parts, but for like reasons they may be expanded. The application of the words of a single provision may be enlarged or restrained to bring the operation of the act within the intention of the legislature, when violence will not be done by such interpretation to the language of the statute. The propriety and necessity of thus construing words are most obvious and imperative when the purpose is to harmonize one part of an act with another in accord with its general intent. The statute itself furnishes the best means of its

own exposition; and if the intent of the act can be clearly ascertained from a reading of its provisions, and all its parts may be brought into harmony therewith, that intent will prevail without resorting to other aids for construction." Lewis' Sutherland on Statutory Construction, section 348.

I do not believe the legislature intended, by this clause in section 7, to confer upon .the board of affairs "the sole and exclusive right to grant" state licenses, but that the word "licenses" was here used in a restricted sense, and applies only to *city* licenses.

The subject matter was the incorporation of a municpality, and the vesting of it with powers which were assential to its government, one of which was the raising of revenues. The legislature was not dealing with the subject of state licenses in this act, and it was not its purpose to change the general plan provided by chapter 32 of the code for the granting of state licenses for the numerous occupations for which the state requires a license and exacts a license tax. In most instances the county court is made the tribunal for the granting of state licenses; in some instances the power is vested in the auditor, as for instance the granting of a license to maintain an automobile; and in some cases the power is given to the secretary of state, as the granting of a license to exist and to do business as a private corporation. For instance, the state exacts a license tax from all domestic corporations, whether they be resident or non-resident, and from all foreign corporations who do business in the state; and by section 30 of chapter 54 of the Code, the license to a foreign corporation is issued by the secretary of state, and all corporation license taxes are collected by the auditor. No doubt some corporations of both classes do business in the city of Bluefield. Now, is it reasonable to suppose that the legislature intended to confer on the city of Bluefield the "sole and exclusive right" to grant state licenses to such corporations to do business in that city? Certainly not. Suppose a non-resident corporation had not obtained a license from the secretary of state, entitling it do business in West Virginia, and should, notwithstanding, desire to locate in, and do business in the city of Bluefield, then, according to the literal construction given by the majority of the court to the clause in question, the board of affairs of the city would

have the sole power to grant both state and city license to do
business within the city.  Such was not the legislative intent.
Such power vested in the city would create too serious a de-
rangment in the system provided by general law for the issu-
ing of state licenses, and the collection of the state's revenues.
It can not be argued that corporation license, and automobile
license which is expressly made co-extensive with the state, are
to be made exceptions, if the clause is to be interpreted literally.
The language is, "and any and all licenses." If this means a
state license in any case, it must mean state licenses in all cases
in regard to which the state exacts a license tax.  If the board
of affairs of the city has the sole and exclusive right to grant
both state and city licenses to sell intoxicating liquor within
the corporate limits, it has also the sole and exclusive right to
grant both state and city licenses to a private corporation to
do business in the city, and to a person to maintain an automo-
bile, because they are some of the things for which the state
exacts a license tax.

In construing the clause in question the whole act should
be considered, and any other section, or clause, dealing with
the subject, or matter embraced in the clause to be interpreted
should be read in connection with it; and, if possible, the sev-
eral parts should be made to harmonize.  This is a rule of
statutory construction that is universally applied.  Turning,
then, to section 59 of the act, which deals particularly with the
subject of licenses, we find that it reads as follows:

"Whenever anything for which a state license is or may be
required is to be done within said city or within two miles of
the corporate limits thereof, the board of affairs as herein pro-
vided may by ordinance require a city license to be had for
doing the same, the amount of which license shall be fixed by
the board of affairs, in no case, however, to be less than the
amount charged by the state for a license for doing the same
thing, and may in any case require from the person licensed a
bond, with sureties and in such penalty and with such condi-
tions as it may deem proper, and the board of affairs on no-
tice, may revoke such license at any time if the condition of
the said bond be broken; and no license to sell strong or spiri-
tuous liquors or wine or beer, ale, porter or drinks of like nature.
within said city, or within two miles of the corporate limits

thereof, shall be granted by the county court of Mercer county, unless the person applying therefor shall produce to said county court the certificate of the board of affairs of said city, that said board of affairs has granted a city license authorizing said person to sell as aforesaid and the same has not been vetoed by the council as herein provided for.

"A person assessed with a city license for the sale of strong or spiritous liquors, or wine or beer, ale, porter or drinks of like nature within said city or within two miles of the corporate limits thereof, shall pay said tax to the treasurer of the city before any such license shall be granted to him by said board of affairs. The board of affairs may impose a license and assess a tax thereon on all wheeled vehicles for public hire and upon all dogs kept within said corporate limits. The board of affairs may prescribe, impose and enforce reasonable fines and penalties, including imprisonment, under the order of the police judge of said city, or the persons lawfully exercising his functions, upon any person carrying on, or attempting to carry on, any business for which a city license is required, without first obtaining a city license therefor and paying the city license tax assessed thereon. All licenses provided for in this act shall be paid to the treasurer of the city, and for the purpose of enforcing the provisions of this section the city shall have police jurisdiction for two miles beyond the corporate limits thereof."

This section, I think, furnishes the true interpretation of the words "any and all licenses" which the city is, through its board of affairs, empowered by section 7 to grant. It means *city licenses*—not both city and state licenses. The qualifying words, "any" and "all," in the controverted clause of section 7, have no reference whatever to the various officers, or tribunals, which are vested by the general law with the power of granting licenses, but they refer to the subjects, or things, for the doing of which a license is required.

Section 59 deals specifically with the subject of licenses; and five points are prominently brought out in it.

(1). That the license spoken of is a *city* license.

(2). That the things to be licensed, under this section, are those things for which a state license is or may be required.

(3). That the license must be authorized by ordinance as provided for in the act.

(4). That the council is given the right of veto. But more as to this point later.

(5). The right vested in the county court by general law to grant, or refuse, state license to sell intoxicating liquors within the town, or within two miles of its corporate limits, notwithstanding the applicant may have obtained a city license therefor, is recognized.

The board of affairs is not authorized to grant a city license unless pursuant to an ordinance passed; and an ordinace can be passed only in the manner provided by the charter.

Section 53 provides the manner of passing ordinances and says that no ordinance shall be passed except by bill. "No bill shall be considered for final passage at the meeting at which it was introduced, but at any subsequent regular weekly public meeting of the board of affairs such bill may be taken up by the board of affairs for final action."

Section 54 provides the manner of keeping the record of "all ordinances passed by the board of affairs and all vetoes of the council."

An ordinance is a local law, and the passing of it is a legislative act concerning which the council is given the right of veto. It can not become a law of the city until it is either approved by the council, or until the council has had an opportunity to exercise its right of veto, and has failed to do so. The granting of a license, pursuant to an ordinance authorizing it, is purely a ministerial act; and, in order to ascertain whether the council has the right to veto a license granted by the board of affairs it is necessary to construe section 18, which reads as follows:

"The right of veto on any franchise or ordinance passed or any license granted by the board of affairs is hereby conferred upon the council, in the manner hereinafter described."

This would appear to give the right to veto any and all licenses granted by the board of affairs. But this section must be read in connection with section 7 which gives the board of affairs the sole and exclusive right to grant all licenses for certain things; that is, for those things for which the state exacts a license tax. The two provisions should be made to harmonize, if possible, and the only way this can be done is to limit the application of section 18 to licenses on those sub-

jects for which the state does not require a license tax. The controverted clause in section 7 can thus be given full effect, and section 18 will be given the broadest effect which it is possible for it to have consistent with section 7.

Section 6 does not vest the corporate powers of the city in its board of affairs absolutely, but only "except as otherwise provided in this act." This shows a purpose to place a limitation upon its powers, and we have to look to other portions of the act to find those limitations. One of them is the right of veto conferred upon the council. Section 18 is an express grant of the veto power to the council; and the purpose of the legislature to preserve this power to the council is shown by expressly reserving it in sections 47, 48 and 49 of the act. Section 49 reads as follows: "Whenever the council shall express its veto of any franchise, *license* or ordinance passed by the board of affairs, it shall, not later than the second day thereafter, cause such franchise or ordinance with its veto thereof and its written reasons therefor, addressed to the board of affairs, to be transmitted to the auditor and the auditor shall submit the same to the board of affairs at its next regular meeting or special meeting called for that purpose, which shall be noted in the minutes of said meeting; but a failure to transmit such franchise, *license* or ordinance within said time shall not render such veto void. If the franchise, *license* or ordinance shall be changed and again passed by the board of affairs, it shall be treated as a new or original ordinance and subject to the veto power of the council."

Moreover, the council is vested with the power of filling vacancies in the board of affairs, and the power of impeaching its members; also, by section 50, with the power to decide a tie in the vote of the board of affairs "on the passage of any franchise, license or ordinance." It is manifest from these various provisions of the charter, which relate directly to the veto power of the council, that the council is not a nonentity in the plan of the city's government, but that it is vested with considerable power, even if it does have to be exercised negatively. Its veto is absolute; it can prevent the passage of any ordinance, and by preventing the passage of an ordinance authorizing a license, it can thus prevent the granting of a license, because the license can only be granted pursuant to an ordinance.

Now let us assume that an ordinance has been passed requiring a city license for the doing of all things for which a license may be properly required, and a city license tax for the doing of each particular thing, among which are some for which the state exacts a license tax and some for which it does not exact a license tax, how is the license to be obtained by the party desiring to conduct the business? If the business is one for which the state does not exact a license tax he makes application to the board of affairs for city license who may grant it; but this license is subject to the veto power of the council because section 18, which defines the power of the council, says: "the right of veto of any franchise or ordinance passed or *any license granted by the board of affairs* is hereby conferred upon the council, in the manner hereinafter described." But if the thing to be done requires also a state license he must apply to the board of affairs for a city license, and also to the county court, or to the person authorized by the general law to grant state licenses, and after obtaining both a city and state license he is authorized to conduct the business. Because, city licenses granted by the board of affairs for the doing of those things for which the state exacts a license tax, are not subject to the veto of the council. Section 7 gives to the board of affairs the sole and exclusive right to grant all city licenses for the doing of those things. The words "sole and exclusive" are used only for the purpose of denying to the council the veto power upon such licenses.

There is another very cogent reason in support of the view that the city was not vested with power to grant state licenses; and that is, that, by the concluding clause of section 59, all license taxes provided for in the act are to be paid to the treasurer of the city; and the treasurer of the city is nowhere in the act expressly made the agent of the state to collect or to receive its taxes. The language is: "all licenses provided for in *this act* shall be paid to the treasurer of the city," etc.

It seems to me that the construction for which I contend is in perfect accord with the general scheme and purpose of the charter, and renders the act harmonious as a whole; whereas, the construction given to the clause in section 7, by the majority of the Court, not only produces a great disturbance in the general plan provided by chapter 32 for the granting of state li-

censes, but also produces an irreconcilable conflict between the different provisions of the charter itself. The most of section 59 of the charter is meaningless, if the clause in question, in section 7, is to be construed as giving the board of affairs the sole and exclusive right to grant any and all state licenses, as well as any and all city licenses. Section 59 recognizes the right as still existing in the county court to grant state licenses for the sale of intoxicating liquors, and inhibits said court from granting such license unless the party applying therefor shall have first obtained from the board of affairs "a city license." In my opinion, the legislature has defined, in this section, what is meant by "any and all licenses" in section 7. Section 12 of chapter 32, vests the county court with the power to grant state licenses to sell intoxicating liquors, and the charter of the City of Bluefield has not expressly revoked it. A literal interpertation of an isolated clause should not be resorted to for the purpose of revoking this power by mere implication, especially when such clause is susceptible of a different interpretation which is more in harmony with the general purpose of the act. I believe that the words "sole and exclusive" were intended only for the purpose of denying to the council the right of veto which had been given to it by section 18 of the act; and that the words "any and all licenses," mean any and all city licenses. I would refuse the peremptory writ of *mandamus*.

It was suggested in argument that any statute which sought to vest in a municipality the sole power to grant state licenses would be in violation of section 24 of Article VIII of the Constitution. If this were the first time this question was presented I would be strongly inclined to that view. But the question has been twice decided by this Court: first in *Wilson* v. *Ross*, 40 W. Va. 278, and again in *Ward & Co.* v. *County Court*, 51 W. Va. 102. In both of these cases the question was fairly presented, and in each case it was decided that such an act was not unconstitutional. In deference to these decisions and to the doctrine of *stare decisis*, I feel compelled to yield my personal opinion concerning the proper construction to be given to that section of the Constitution. These decisions have come to be recognized as the law, and I do not think the principle involved is of sufficient importance to justify their overturning at this time, even if a majority of the Court should be so inclined.